**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA**

**CRIMINAL NO.  18-20469**

**vs.**

**HON. NANCY G. EDMUNDS**

**D-1   BRIAN KISCHNICK,**

          **Defendant.**

_____/

**SENTENCING MEMORNADUM OF THE UNITED STATES**
**AS TO DEFENDANT BRIAN KISCHNICK**

## I.      INTRODUCTION

As the chief administrator of the City of Troy, Oakland County's largest city, Kischnick contracted to perform his duties "with the highest moral standards and principals;" be "dedicated to the highest ideals of honor and integrity in all public and personal relationships in order that he may merit the respect and confidence of elected officials, or officials and employees, and of the public;" and, "conduct himself so as to maintain public confidence in his profession, in the local government, and in  the performance of the public trust."  However, during his tenure as the City Manager, Kischnick would ignore all ethical standards imposed on him and breach them over and over again. Kischnick was a rapacious manager who eventually came to treat the pockets of contractors, business owners and others attempting to do business in the city as his own and request cash bribes, free meals

and alcohol and eventually free housing and amenities for over three years, totaling over $50,000.  For years, Kischnick was a serial violator of the most basic rules of ethics, both in his management of the City and through his solicitations of bribes, meals, services and other things of value.  And he now stands before this Court lacking any shame or remorse about his conduct.

## II.   ARGUMENT

### A.  The Nature and Circumstances of Kischnick's Crimes (18 U.S.C. § 3553(a)(1)

#### 1.  Kischnick's Power as City Manager

From 2012 through 2016, Kischnick served as the City Manager of the City of Troy ("City").  As the City's chief administrative officer, he was responsible to Council for the efficient administration of all administrative departments under the direction of the City government, except the department under the direction of the city attorney. The City Charter imbued him with the power to appoint the heads of several city departments and to discharge such department heads without the consent of, or interference or influence by Council, and to direct and supervise such department heads, who served at the will of the City Manager. (City of Troy: Profile for the Position of City Manager at 11, 12-13).  As City Manager, Kischnick's functions and duties also included, among other things, to recommend to the Council for adoption such measures as he deemed necessary and expedient.  In other words,

Kischnick ran the City and carried tremendous influence over Council decisions by virtue of his position and the authority vested in him.

During his tenure as City Manager, Kischnick blatantly violated nearly every ethical rule that governed his employment. And in so doing, Kischnick also violated the law. He would become so emboldened with power over the course of his tenure as City Manager, that he would regularly use his office to solicit bribes and other things value for his personal gain. He not only committed some of the most egregious violations, he also corrupted other at will city employees that he supervised to facilitate his illegal conduct, serving as the poster child of an abuse of power and the public's trust.

## 2.  Kischnick Demands Bribes from Dilisio Contracting, Inc.

Since April of 2014, Dilisio Contracting, Inc. ("Dilisio") held the exclusive contract for concrete paving for the City's roads and thoroughfares. While Dilisio was a contractor for the City, Kischnick repeatedly extorted and demanded bribes from the company.  Although the specific solicitation from Dilisio that gives rise to the discovery of Kischnick's illegal conduct here would not occur until October 2017, when Kischnick's solicited $15,000 from Dilisio, the investigation would reveal that Kischnick had made numerous other illegal demands from Dilisio.  Two years earlier, in September of 2015, Kischnick contacted the Director of Public Works for the City, Kurt Bovensiep, and told him he wanted Dilisio to replace the

driveway at his (Kischnick's) personal residence.  Although Dilisio only performed commercial concrete work, Kischnick directed Bovensiep to coordinate with Dilisio to construct a new driveway at Kischnick's residence (PSR ¶13). At Kischnick's direction, Bovensiep contacted Dilisio, advised them of Kischnick's request and provided Dilisio with Kischnick's mobile phone number. Dilisio agreed to remove and replace Kischnick's driveway, and Dilisio agreed to only charge for its labor and costs, not any profit.

In an effort to avoid suspicion and detection, Kischnick directed Dilisio to use vehicles that did not depict Dilisio's logos on them while working on Kischnick's driveway.  Dilisio complied. When Kischnick later decided that he wanted to expand the driveway, but an oak tree on Kischnick's property would require removal first, Kischnick contacted Bovensiep again and directed him to contact the City's forester to have it removed.  Bovensiep followed Kischnick's directive.  The City's forester agreed to remove the tree for the same rate the forester charged the City.  Once the City forester removed the tree, he sent the invoice in the amount of $543.33 to Bovensiep. Bovensiep contacted Kischnick about payment. Kischnick directed Bovensiep to send the invoice to Dilisio.  Kischnick told Bovensiep, "they [Dilisio] would pay for it."

In September 2015, Dilisio removed and expanded Kischnick's driveway and agreed to pay the City forester for the removal of the tree. Following completion of

the work, Dilisio provided Kischnick an invoice, in the amount of $3,500, which Dilisio claimed included the cost of tree removal.  Kischnick, having already demonstrated that he never intended to pay for the removal of the tree, never paid Dilisio for the work done on his driveway. Nor did Kischnick ever intend to. Even after a councilman who learned about the driveway confronted Kischnick and following a conversation with another public official who advised Kischnick to pay for the improvements, Kischnick never did. He knew he had nothing to fear. He knew that Dilisio would not demand payment; Kischnick administered Dilisio's exclusive no bid contract for the City, and his recommendations regarding City contractors carried significant weight and authority. As Kischnick expected, Dilisio never requested payment from Kischnick on its invoice. And Dilisio would soon begin a pattern of paying bribes to Kischnick.

Following the driveway bribe, the stage was set; Kischnick knew the Dilisio's pockets were open for further exploitation. Approximately two months after the completion of the driveway, Kischnick was in Dilisio's pockets again.  In December of 2015, Kischnick directed Bovensiep to contact Dilisio to arrange to meet for dinner during the Christmas holiday. Much like he would arrange later in preparation of receiving another bribe from Dilisio, Kischnick wanted to meet at a restaurant outside of the City to conceal his misdeeds.  He preferred to meet at a restaurant in Detroit.   Bovensiep arranged the dinner as directed.

The Christmas dinner group included Dilisio representatives Dino Dilisio and Joe Lia of Dilisio (collectively Dilisio), Bovensiep and Kischnick. They dined at Vicente restaurant in Detroit, where they had dinner and Kischnick plied himself with "very" expensive wine. Dilisio picked up the tab. However, Kischnick was not done and apparently threw caution to the wind about being seen in the City with Dilisio. He wanted to continue the party at Ruth's Chris Steak House in Troy and have others join. The car service that Dilisio arranged to transport Kischnick proceeded to Ruth's Chris with Kischnick and Dino Dilisio. Bovensiep and Joe Lia drove separately. While there, Kischnick met up with another female City employee with whom Kischnick dined on more food and wine while the remainder of the group sat at the bar having drinks. After Kischnick decided that the bar hopping should continue even longer at Mon Jin Lau restaurant in Troy, Dilisio paid for the food and drink all had consumed while at Ruth's Chris and later the tab at Mon Jin Lau. The night ended with Bovensiep transporting a drunken Kischnick to Kischnick's vehicle, which was still parked in the City's parking lot. The government does not know the total cost of this outing, but based on the other evidence in this case and the restaurants the group frequented that night, it is reasonable to conclude that Dilisio paid hundreds of dollars for the night.

During Christmas 2016, Kischnick, Bovensiep, and Dilisio met again. Again, Dilisio paid for the food and alcoholic beverages the group consumed at Mon Jin

Lau.  At another time in 2017, Bovensiep recalled that the group met for lunch at Maggiano's Little Italy in Troy.  While there, Kischnick ordered expensive wine and consumed so much that Bovensiep became concerned, especially since following the lunch, Kischnick drove off in his City-issued vehicle.  And of course, Dilisio picked up the tab.  Each meal typically was in the hundreds of dollars.

However, after years of satisfying Kischnick's every request, in October 2017, when Kischnick demanded $15,000 from Dilisio in "donations" to defeat a city charter amendment that Kischnick claimed, if passed, would negatively impact renewal and or extension of Dilisio's contract, Dilisio had had enough.  It all started with a call from Kischnick to Dino Dilisio on Sunday, October 1, 2017. Kischnick called Dino Dilisio and told him that the City had passed petitions that would affect City contracts and developers.  Kischnick told Dino Dilisio, "I need you to help us out." Dino told Kischnick that he would call Kischnick the following day.  Kischnick and Dilisio met next day, but before they met, Bovensiep had advised Kischnick that Dilisio had failed to dispose of asphalt millings that Dilisio had left on City property and wanted the City to dispose of it at a cost of approximately $7,500, according to Bovensiep.  Kischnick told Bovensiep that he would discuss the excess millings with Dino personally because he had planned to meet with Dino.  Armed with this information about the asphalt millings, and apparently in preparation for the significant bribe Kischnick would make of Dino, Kischnick sent Dino a text message

stating: "I told Kurt [Bovensiep] that we will keep the remaining millings."  After Dino responded, "OK sounds good thanks," Kischnick responded, "I really need your help dino (sic)."

At the meeting that followed those exchanges, Kischnick told Dilisio that he needed the money to be divided among three different entities and paid with cashiers' checks in the amounts of $10,000, $2,000 and $3,000.  Kischnick handed Dilisio a torn piece of an envelope on which were written initials and terms for the entities to which Kischnick wanted the checks made payable to–GCH-$10,000; OJG-$2,000; and, Sting-$3,000.

Kischnick told Dilisio that the money was for a developer.  Kischnick then asked Dilisio, "What is it you need from me?"  Kischnick's request made Dilisio feel uncomfortable. Dino thought the Dilisio contract with Troy would be in jeopardy if he did not honor Kischnick's request for $15,000. At some time later, Dino Dilisio and his brother, Joe Dilisio, researched the terms on the paper Kischnick provided and learned that they were names of local hockey teams associated with Kischnick's son.

Days after the meeting with Dino Dilisio, Kischnick contacted Joe Lia of Dilisio, on October 4, 2017.  Kischnick both called Lia and sent several text messages requesting "help."  Lia met Kischnick at his office in Troy City Hall in the afternoon on October 4, 2017.  At the meeting, Kischnick falsely claimed that the

8

funds he had requested were needed for a "Charter Amendment" and a "Say No Campaign," telling Lia that this "charter amendment" would somehow put Dilisio's contract with Troy in jeopardy.  Lia later learned that the fundraiser for the "Say No Campaign" had already been held approximately two weeks prior to Lia's meeting with Kischnick. Lia was angered by Kischnick's solicitation and thought that Kischnick was engaging in a pay-to-play scheme.

Following these encounters with Kischnick, Dino Dilisio contacted Bovensiep. Dilisio advised Bovensiep of Kischnick's solicitation. Dilisio also told Bovensiep that he perceived Kischnick's comment about the supposed impact the charter amendment would have on Dilisio's contract as a threat.

Bovensiep assured Dilisio that the charter amendment would have no effect on the Dilisio contract because the amendment related to the City's use of land and facilities, while Dilisio's contract concerned maintenance and repair of the roads. Bovensiep further questioned the lack of any connection to the charter amendment and any of the entities to which Kischnick had directed Dilisio make payment. Dilisio complained to Bovensiep that he felt Kischnick was engaging in a pay-to-play scheme and sought Bovensiep's advice.  Bovensiep eventually sought guidance from Troy police.

Shortly after Bovensiep met with Troy police, Dino Dilisio contacted Bovensiep to advise him that Kischnick had been texting Dino incessantly.  The

same day that Lia met with Kischnick at City Hall, Bovensiep saw Lia in his truck which was parked in front of city hall.  Lia was visibly upset while Bovensiep and Lia discussed Kischnick's request. Lia thought Dilisio's contract with Troy would be in jeopardy if he did not give Kischnick the funds.  Nonetheless, Lia told Bovensiep that he was unwilling to give Kischnick the funds. Both were also afraid that honoring Kischnick's request would only open the door to future extortionate tactics by Kischnick.

After Bovensiep's discussion with Lia, Bovensiep contacted Troy police again. Troy police referred Bovensiep to the Federal Bureau of Investigation ("FBI").  And on October 5, 2017, Bovensiep met with FBI agents and disclosed, among other things, his conversations with Dino Dilisio and Joe Lia relating to Kischnick's solicitation of the $15,000 bribe, as well as other gifts and free services, including Kischnick's driveway improvements, Dilisio had provided to Kischnick.

Subsequently, on October 6, 2017, Dino Dilisio, Joe Dilisio and Joe Lia (collectively "Dilisio") met with agents. In addition to that already detailed above, the contractors told agents that Troy is one of their biggest clients. Dilisio admitted to replacing Kischnick's driveway in 2015 for costs and labor only, and told agents they gave Kischnick an invoice for the work, but never received any payment. However, nor had they ever asked for payment on the invoice.  Dilisio also confirmed that they paid the $543.33 invoice from the City's forester for removing

the oak tree at Kischnick's residence, which Dilisio said they included in the $3,500 invoice they sent to Kischnick.  They also admitted they colluded with Kischnick to conceal their identity while working on Kischnick's driveway. They did not use any vehicles with the Dilisio logo on them, as Kischnick directed. However, their efforts were in vain because neighbors observed something fishy--individuals in unidentifiable trucks performing work on Kischnick's driveway. Following their interview with FBI, Dilisio and Lia agreed to cooperate.

On December 21, 2017, acting under the direction of FBI agents, Dino Dilisio met with Kischnick at the Fogo De Chao restaurant in Troy for a prearranged "Christmas lunch." Several other City employees, who Kischnick personally invited, were also there.  Kischnick and Dilisio discussed Dilisio's contract and the extension of the contract.  Dilisio expressed concern about Council's approval. Dilisio paid for the food and alcohol that was consumed, in an amount totaling $1,287.30.  After the festivities, Dilisio and Kischnick retreated to Dino's truck where Kischnick accepted $1,000 in cash from Dilisio in exchange for supporting the renewal of the Dilisio contract and its extension with Troy.

In the months that followed the $1,000 Christmas bribe and before City Council voted on the Dilisio contract renewal and extension, Kischnick began to regularly solicit funds from Dilisio to pay his exorbitant food and bar tabs at expensive restaurants.  No fewer than ten days after the Christmas bribe, on January

1, 2018, Kischnick contacted Lia and directed him to open a tab for Kischnick at Mon Jin Lau.  Lia covered the $302.28 in food and alcohol that Kischnick and his party consumed.

Numerous city employees advised FBI agents that Kischnick engaged in an unusually strong interest in the Dilisio contract.  For example, Kischnick removed the Engineering Department from a paving project slated for the Somerset Park Apartments and demanded that the paving be completed with concrete instead of asphalt (Dilisio does not do asphalt work), even though requests to repave the roads near Somerset with asphalt had been ongoing for over two years with the prior owner of Somerset. Between July of 2015 and January of 2017, the roads near Somerset were slated to be paved in asphalt.  However, approximately six months after Kischnick moved into a Somerset townhouse where he lived rent free, the project was changed to concrete paving and Dilisio was assigned the contract.  Kischnick also reallocated funds from another budget to help fund the Dilisio's contract extension and the additional proposed work.  And while other City employees believed that it would be prudent to bid out the contract for concrete paving because Dilisio had held the no-bid contract for so long, in keeping with his agreement with Dilisio, Kischnick advocated for an extension of Dilisio's contract instead.

On January 9, 2018, acting under the direction of FBI agents, Lia met with Kischnick at the Bella Piatti restaurant in Birmingham, Michigan.  Kischnick and

12

Lia discussed the status of Council's approval of Dilisio's upcoming contract extension pending before City Council. Kischnick assured Lia he had advocated for the renewal and the extension of the Dilisio contract.  During that same meeting, Lia told Kischnick that he would "make it rain," if Kischnick secured the contract extension approving the additional work.   The meeting ended with Lia paying the $789.02 tab for the meals and alcoholic beverages.

On January 22, 2018, based on Kischnick's recommendation, City Council awarded Dilisio a one year contract to provide concrete slab replacement services with an option to renew for one additional year. The Council also followed Kischnick's recommendation to transfer $1 million from the Capital Fund-Streets and Drains Major Road budget to the 2018 Capital Fund-Streets and Drains Major Road appropriations budget for the slab replacement within Somerset Park Apartments and to transfer $2.2 million from the General Fund to the Capital Fund for the local slab replacement and municipal parking lot improvements. Council approved Dilisio as the contractor for the work.  Council adopted Kischnick's recommendations without any knowledge of Kischnick's bribes from Dilisio or his rent free residency and other free amenities at Somerset Apartments. Kischnick never disclosed that.

The day following the Council's approval, on January 23, 2018, Kischnick contacted Lia and told Lia the contract extension and expansion of the contract had

been approved by the Council, as Kischnick promised. During that consensually recorded conversation, Kischnick reminded Lia that Lia needed to "make it rain." After Lia agreed, they made arrangements to meet on a future date.  Kischnick warned, however, that he'd rather meet at a restaurant in Detroit to avoid detection.

But even before they had an opportunity to meet, Kischnick called Lia with requests for Dilisio to fund Kischnick's frequent carousing. Now, that the contract matter was settled, Kischnick did not even require that anyone from Dilisio attend. On February 25, 2018, while Lia was vacationing in Florida, Kischnick called Lia several times.  Kischnick wanted Lia to pay for yet another night on the town at Mon Jin Lau.  Lia opened a $250 tab.  Kischnick would spend about $135.00 there.  That same night when Kischnick moved his party to another one of Kischnick's spots, Bella Piatti, Kischnick contacted Lia again.   Lia opened a $350.00 tab there. Kischnick used it all.

On March 6, 2018, acting under the direction of FBI agents, Lia met with Kischnick in Troy.  While seated in Lia's truck, Kischnick accepted a $2,000 cash bribe from Lia in exchange for Kischnick's assistance with the renewal and the expansion of Dilisio's contract with Troy.  The following exchange occurred as the deal was consummated:

> Kischnick:   This is yours.  I know you only got two.
>
> Lia:        Yeah, I only have frickin' ones here.  Here you go, two grand.

Kischnick:  Alright, so you owe me eight.

Joe:        I owe you eight and then for next year, what can we do?

Kischnick:  I mean you gotta make it rain first.

Lia:        Alright, Alright for sure.

Kischnick:  Don't, look, the good news is we're always on your side no matter what.

Lia:        Yeah, well I don't know.  Well that's good, but, uh alright, yeah next week, next week, I'll, uh, try to get you three if I can and just, uh get you paid off so that way you can take your girlfriend out.

Kischnick:  Hurry up.

Lia:        Alright.

Kischnick:  Thanks brother.

Through this conduct, Kischnick proved that he was "always on your side no matter what," if you paid him enough bribes.

### 3.  Kischnick Takes a Free Townhouse, Furniture and Utilities at Somerset Park Apartments

Somerset Park Apartments is an approximately 2,200 unit apartment complex located at 1911 Golfview in Troy, Michigan.  While City Manager, Kischnick lived

rent free in a two-story townhouse and received free monthly rental of furniture and free utilities, totaling over $40,000.[1]

In approximately June of 2015, the Solomon organization ("Solomon Group") assumed ownership of the Somerset Apartments.  After the purchase, the former owner of Somerset introduced the Solomon Group to Kischnick.  During their very first meeting, Kischnick made certain expectations known.  While they all met in Kischnick's office in City Hall, Kischnick inquired whether he would be allowed to continue to golf for free at Somerset's golf course. Kischnick also discussed plans to replace the roads surrounding the Somerset Apartments, something the former owner of Somerset had been attempting for years.

---

[1] Originally, the government had intended on presenting witness testimony concerning the disputed guidelines issue of whether to include the approximately $42,000 worth of free rent on the townhouse and other amenities that Kischnick took from the Solomon Group and Somerset apartments.  Upon further examination, however, it was decided that an evidentiary hearing with live witnesses was unnecessary given that there are no actual factual issues in dispute between the parties.  Instead, the parties have a dispute over the interpretation of those undisputed facts and the legal application of the guidelines to those facts.  As a result, the government is providing a detailed description in this sentencing memorandum of the facts underlying Kischnick's acquisition and use of the free townhouse from Somerset and Kischnick's actions as a public official relating to Somerset and Dilisio.  The government has provided Kischnick's counsel with all of the FBI reports and documents from the investigation relating to the issues concerning Somerset, the Solomon Group, and Dilisio.

Kischnick's corrupt intent was evident.  At some point prior to the sale of Somerset to the Solomon Group, Kischnick contacted the former owner and requested an apartment due to his pending divorce. The former owner directed Kischnick to Somerset's rental office.  However, in June 2016, after the Solomon Group had assumed ownership, rather than go to the rental office at Somerset, or any other rental office, Kischnick, much like he operated with Dilisio, contacted the owner of Somerset who resided in another state, fully knowing that he intended to use his position for personal gain.  Kischnick would later tell investigating agents that he selected Somerset because it was the "premier" apartment complex in Troy, and it was close to his home.  Kischnick also told FBI agents that he believed his calling the owner of Somerset would result in a significantly discounted or free apartment due to his position.  And Kischnick was right.

During a meeting with the government, Kischnick acknowledged that he should have been paying $1,200 a month in rent, and that he exploited his position as the City Manager to live at Somerset for free.  Kischnick knew the weight of his position and was banking on Solomon to provide him a free apartment. And although Solomon agreed to provide housing for Kischnick on a short term basis, Kischnick never mentioned payment of any sort because much like the free driveway and expensive meals and liquor that he had acquired from Dilisio, Kischnick did not intend to pay rent at Somerset at any point, nor did he ever pay anything towards his

residence there before he moved out in October of 2018. As he expected, Zach Solomon agreed to give Kischnick an apartment and referred Kischnick to Somerset's local property manager, Ryan Henderson, who Zach Solomon directed to accommodate Kischnick on a short term basis.

Kischnick contacted Henderson and told him he needed a two bedroom apartment. And if a free apartment were not enough, Kischnick requested a sofa, coffee table, television stand and bedroom furniture. Following Zach Solomon's directive, on June 21, 2016, Henderson gave Kischnick the keys to a two bedroom townhouse at Somerset that was partially furnished by the Solomon Group. Kischnick made no arrangements to pay rent or utilities or for the monthly rental of the furniture. Literally, all of his living expenses were paid by the Solomon Group for nearly three years. The total benefit to Kischnick received was approximately $54,000, $42,599.50 of which Kischnick received while he was still the City's manager.

Christopher Burgess, Solomon Group's local district manager who resided at Somerset at the time, learned of Kischnick's free tenancy from Henderson after Kischnick moved in. Once he became familiar with the details, Burgess was "shocked" by Kischnick's request for a free apartment, recognizing the request came with the full power of Kischnick's office. Burgess viewed it as a direct conflict of interest. Burgess recalled how he found Kischnick's request for free golf during the

Solomon Group's first meeting with Kischnick off-putting, but he left it to the owners to decide whether they would accommodate Kischnick's request.  Burgess stated residents were not even allowed to play the golf course for free, but, the owners of Somerset allowed Kischnick to continue to play golf at Somerset at no cost before Kischnick even lived there.

By October 2016, Henderson had become concerned about Kischnick's rental status and expressed his concern to Burgess, Henderson's supervisor.  Since Burgess was expecting Zach Solomon in Michigan shortly after Burgess' discussion with Henderson, Burgess planned to meet with Zach Solomon and Henderson to discuss Kischnick's tenancy.  Time did not permit a face-to-face meeting during that trip, but Burgess had communicated to Zach Solomon that Kischnick was in the news related to allegations in a whistleblower complaint, and Burgess emailed a link to an article in a local newspaper about Kischnick.  Upon receipt, Solomon replied, surprisingly, "Is he still there?"  Solomon admitted to FBI agents that he should have corrected what he saw as a problem at that point, but was uncertain how to deal with a city manager who stayed in free temporary housing long past the intended agreement.  Solomon was concerned that Kischnick could use his position to retaliate against Solomon Group if they asked Kischnick to leave.  Solomon thought this could result in a disruption in business and negative press that could affect rental business at Somerset.  Solomon chose not to deal with Kischnick at that time.

Approximately nine months after residing at Somerset rent free, Kischnick contacted co-owner Marc Solomon, in or about, March 2017, to discuss the road project near Somerset.  Marc Solomon, Burgess and the Solomon Group's lawyer, Mark Rosen, participated in a conference call in which Solomon voiced his concerns about the obstructions the road project would cause; whether the project included replacement of the aprons (driveways) and the adjoining sidewalk; and whether Troy would replace the current asphalt with concrete.  Afterward, Solomon Group owners became increasingly concerned about Kischnick's continued residency at Somerset.  Mark Solomon and Zach Solomon were particularly concerned that if they evicted Kischnick while the paving project was pending, Kischnick could use his position to interfere with the project and disrupt operations at Somerset.  They resolved not to take any action against Kischnick to avoid any problems.

In April 2017, representatives from the Solomon Group, Kischnick, Bovensiep, other city employees and Dilisio met to discuss the road construction near Somerset.  During that meeting, the Solomon Group learned that aprons were not included in the City's plans, as Kischnick had originally indicated.  Bovensiep found Kischnick's presence at the meeting very unusual because the meeting merely involved day-to-day operational coordination and never before had Kischnick, or any other City Manager in Bovensiep's career, participated in meetings of this type.

Later, the Solomon Group conveniently hired Dilisio to replace the aprons and the adjoining sidewalks at the same rate Dilisio charged the City for its cement work. They also discussed moving up the timing of the construction to reduce the disruption to the residents at Somerset.

During these negotiations, coordination, and afterward, Kischnick continued to reside at the Somerset rent free. Neither Kischnick nor the Solomon Group disclosed this arrangement to the City before they negotiated a contract with a City contractor in conjunction with other City work being performed. Kischnick resided at Somerset continuously from June 21, 2016 through March 11, 2018, while he was City Manager of Troy, free of charge, thereby receiving a benefit totaling $42,599.50. Kischnick did not vacate his townhouse at Somerset until October of 2018 after having lived there for over three years rent and utility free.[2]

Kischnick's coordination of the repavement of the roads near Somerset raised suspicions by many in the department. Bovensiep stated that Troy had originally

---

[2] On July 23, 2018, Solomon Group management sent Kischnick a Notice to Quit, advising him that if he did not move out of the apartment by August 23, 2018, they would commence eviction proceedings against him. Kischnick did not vacate the property. Therefore, on August 24, 2018, Somerset filed a Complaint to evict Kischnick. On August 28, 2018, the 52-4th District Court issued a Summons, ordering Kischnick to appear in court on September 19, 2018, at 10:00 a.m. However, on September 11, 2018, the parties entered a consent judgment which was entered on September 17, 2018, which gave Kischnick until October 1, 2018, to move out or face eviction.

planned for the roads around Somerset to be paved with asphalt because they were already covered with asphalt and asphalt is more economical, but Kischnick insisted that they be replaced with concrete.  Initially, in 2015, the roads around Somerset were slated to be rehabilitated by milling off the existing asphalt pavement overlay, repairing joints and damaged concrete and then placing new asphalt overlay over the roads.  However, by then, Kischnick had arranged for the roads to be replaced with concrete by Dilisio, the only concrete vendor providing services to Troy. The approval of the Dilisio contract and expansion also resulted in the acceleration of the date for the repair of the Somerset roads. They were originally slated to be completed in 2019, but after the approval of the Dilisio contract, the repairs were included in the 2018 Troy city budget.  According to several witnesses, this re-prioritization of the Somerset project by Kischnick was intentional.  Numerous employees observed Kischnick fail to follow normal procedures when dealing with the Somerset Apartment road construction project and Dilisio.

Kischnick used his position as City Manager to get money, meals, liquor, a free driveway, landscaping, and a rent-free townhouse with free utilities and furniture. In exchange, Dilisio got a city contract and additional work, while Somerset got repair of its roads in concrete, not asphalt, and other repairs at a reduced rate.

**B. <u>Kischnick's History and Characteristics</u> (18 U.S.C. § 3553(a)(1))**

On March 11, 2018, the City terminated Kischnick's employment. By then, he had accepted numerous bribes and was a serial violator of the most basic ethical rules governing public officials.  And, unfortunately, Kischnick did not confine his misconduct to the presumably deep pockets of contractors, business owners and those attempting to do business in the City.  He exploited the City's coffers, too.

It was evident to numerous employees and department heads with long histories of serving the City honorably that Kischnick was up to no good.  His unethical demands and directives were unlike any many employees, especially the Accounting Manager and the Recreation Director, who had served the City for 26 years and 24 years, respectively, had ever encountered.  So egregious was Kischnick's conduct that both the Accounting Manager and the Recreation Director voiced their concerns to the Human Resources Director, who, in turn notified Council.

After receiving the list of concerns by the City employees concerning Kischnick's conduct, the Council commissioned attorney Craig Lange to conduct an independent investigation of Kischnick's conduct.  Lange began that review in June 2016.  He interviewed numerous City employees and other witnesses, including

Kischnick.  Lange issued a report of his findings ("Lange Report") to the Mayor and

Council on July 14, 2016.

Lange investigated issues raised by the Account Manager relating to certain

financial transactions conducted by Kischnick:

1. Multiple purchases of phone accessories and phone purchases;
2. Receiving a car allowance but also driving a City car;
3. Purchase of a new vehicle for the City Manager within the context of a request for vehicles that were not budgeted or otherwise requested;
4. Excessive food purchases;
5. Natural gas contract;
6. Repair of a City vehicle by Pennington Collision; and a Holiday Card purchase.

(Lange Report at 4).  Lange also investigated the Recreation Director's concerns

regarding Kischnick's demand for free membership passes to the Community

Center and Aquatic Center for himself and his family (including his mother-in

law); for two sisters who resided in Birmingham, Michigan and their children

(including 10 yoga passes); and for a city contractor, which deprived the City of

over $1,000 in potential revenue.

(Lange Report at 8-14).

Revelations Lange made during his investigation are both enlightening and

relevant to this Court's assessment of Kischnick's history and character for

purposes of sentencing. They illustrate that Kischnick was willing to violate any

ethical or legal limits in order to benefit himself.  The relevant results of Lange's

findings are summarized below.

- **Receiving a car allowance, but also Driving a City Car;**
  **and Repair of City vehicle at Pennington Collision**

Pursuant to his May 2015 employment contract, Kischnick received an

automobile allowance of $425 per month "for the use of his personal automobile in

the course of the City's business." (Lange Report at 40).   Kischnick initially

contracted to use his personal vehicle for all City business. In fact, the contract

commanded that Kischnick use his personal vehicle, in lieu of mileage and

reimbursement, in exchange for the car allowance.  *Id.* However, when Kischnick

grew tired of using his own vehicle, he requested a vehicle from the City's fleet of

City owned vehicles. When he was advised that such an arrangement would

terminate his car allowance, Kischnick contrived a request for a pool car for his

department so that he could maintain his monthly car allowance. However, after

Kischnick saw the compact vehicle assigned to his department and, ostensibly

realizing it did not comport with the lavish image Kischnick wanted to project,

Kischnick returned the vehicle.

A short time later, in January 2016, Kischnick directed the City's Motor Pool

Superintendent to request the purchase of a fully loaded Jeep Grand Cherokee. In

response to that directive, the Purchasing Manager prepared a draft of the

memorandum regarding the purchase for council's consideration.   In it, the Purchasing Manager disclosed that the Jeep was being purchased for use by the City Manager. (Lange Report at 41).   Kischnick later modified the memorandum and added three additional vehicles, two 2016 SUV Ford Interceptor and one 2016 Dodge Charger, in addition to the 2015 Jeep, for a total cost of $112,448.   *Id.* Kischnick deleted any reference that the Jeep would be utilized by him.

The City's Purchasing Manager questioned the necessity for the three vehicles. They were not in the budget nor had they been otherwise requested. In the end, the Dodge Charger was never purchased and the two Ford Interceptors were never used, according to the Purchasing Manager *Id.*   However, the City acquired the Jeep, Kischnick used it exclusively, all while he continued to receive his monthly $420.00 car allowance. And within two months of acquiring the Jeep, on March 30, 2016, Kischnick would have an accident in the Jeep and attempt to cover up the accident by convincing the driver not to file a police report and directing the driver to have her vehicle repaired at a private collision shop.

In a direct violation of the City's Administrative Memorandum that commands "all employees" of every accident shall report the accident "immediately if possible but not later than two (2) business days," Kischnick would not file the incident report for approximately two months, and only after his deceit had been uncovered when the collision shop submitted an invoice to the City for payment.

(Lange Report at 5-8). And when Lange questioned Kischnick about his failure to follow the reporting procedures, Kischnick claimed ignorance of the requirement, but alternatively boldly proclaimed that, generally, he was not subject to the City's administrative memorandums because "he [was] able to write, amend, and create new ones and empowered to refrain from following them when he believes it is in the best interest of the City not to do so." (Lange Report at 8).

But Kischnick's conduct with regards to the accident was not in the best interests of the City Lange concluded. Lange found that Kischnick had acted in his own best interest, and his failure to report actually did cost the City because the City was forced to pay $1,560 to repair the vehicle that would have otherwise been covered by the driver's insurance company under Michigan's No-fault insurance laws. Kischnick would stop driving the Jeep that he guilefully obtained only after he was forced to when Lange submitted his findings regarding its purchase.

- **Community Center and Aquatic Center Passes for City Manager and Family; and Other Individuals**

Lange also investigated a complaint made by the Director of Recreation ("Director") regarding Kischnick's demand for free memberships to the City's Community Center and Aquatic Center, which is worth noting. On May 27, 2014, just over a year after his November 2012 appointment as City Manager, Kischnick called the Director, claiming that, based on his evaluation meeting he had with Council, he was entitled to free family membership passes to the Community Center

and the Aquatic Center. (Lange Report at 8). Since in her 22 years as a city employee, the Director had no experience with such a request from any City employee, including former City Managers, she only complied after discussing the request with the Assistant City Manager, who initially thought Kischnick was kidding, but told the Director she should issue the passes if she did not want to "piss off Brian and [have] him on [her] bad side." (Lange Report at 8). However, the Assistant City Manager warned the Director to "document/CYA." (Lange Report at 8, Exhibit 10). Free membership to the Centers was not a part of Kischnick's employment agreement and there was no addendum to his employment agreement that provided for free membership at the City's revenue generating facilities.

Fearing retaliation if she did not comply, the Director issued the free memberships to Kischnick and his family, but she would "document" and "CYA" as she was advised with a memo to the Human Resource Director in which she stated:

> I've worked here 22 years and have never heard of any employee, manager or director getting anything for free especially nearly $900 worth of stuff! IF(sic) the council did give him these memberships, there should be something in writing from our records so it doesn't look like I am making the random decision about the memberships. It also doesn't look well when the remainder of the city employees do not get any benefit on fitness memberships (I know we will be working on this). Thank you, Recreation Director.

(Lange Report at 8-9).

A couple of months later, on July 21, 2014, Kischnick demanded that the Director add his mother-in-law to his list of family members entitled to use the two facilities free of charge. Then, approximately two years later, on May 12, 2016, during the span of Kischnick's other illegal conduct here, Kischnick sent a text message to the Director, directing her to issue free memberships to the two facilities and "a 10 pack of yoga passes" to an individual (and her children) who Lange concluded, based on the evidence, was engaged in a personal relationship with Kischnick. Moreover, the individual was not a resident of Troy. And if that were not egregious enough, approximately two weeks later, on May 25, 2016, Kischnick demanded free annual passes to both facilities to that same individual's sister and her four children and one free pass for the Aquatic Center for a City contractor, all at the expense of the residents of Troy. (Lange Report at 10-14). Kischnick would deprive Troy residents of $1,261.50 in revenue from these free nonresident passes. *Id*.

Kischnick's responses to this subject of Lange's inquiry are telling. He initially told Lange he had the authority to issue free passes to the "indigent." However, after others learned of his requests, Kischnick later claimed to have rescinded the multiple passes for the two Birmingham residents, indicating he did so only after the free passes issued to his own family became an issue. (Lange at 12-13). Moreover, Lange found that Kischnick's explanations were disingenuous, in

part, because the Birmingham sisters appeared to be far from "indigent" or "down and out," Kischnick's alleged basis for making the request. *Id*. at 13. Lange found Kischnick's conduct unwarranted, inappropriate, beyond his authority, and in violation the Michigan Constitution's prohibition against municipalities lending its credit to any person, association or corporation.  (Lange Report at 13).

Lange also investigated the other complaints outlined above which included, much like the vehicle purchase, the misappropriation of City's funds for multiple, excessive purchases of $200 wireless headphone sets and other phone accessories, totaling over $1,000 and the purchase of a Kate Spade Gift Set, that appeared to be a personal gift and despite the fact that Kischnick received a monthly $100 stipend for technological expenses.   Throughout his investigation, Lange found that Kischnick had repeatedly disregarded the City's rules and procedures, including the hiring of an individual with whom Kischnick was having a romantic relationship.

What is apparent from the pages of Lange's report is the god complex with which Kischnick operated while City Manager.  He did not follow the rules. He felt they did not apply to him. Kischnick "sought to champion his own self-interests, rather than the best interest of the City of Troy and the Policy set forth in 1-P-3." (Lange Report at 47).

Based on the testimony of other witnesses, other documentary evidence, Kischnick's own conflicting testimony and Kischnick's manner of answering questions, Lange found that Kischnick lacked credibility.  Lange further concluded:

> One final observation needs to be made on the topic of boundaries.  Throughout this report are examples of behavior which has not recognized or heeded established boundaries.  In my opinion the Manager's behavior has failed to comply with Charter provisions concerning hiring and contracts.  He has not complied with provisions of the City Code. He has not complied with provisions of the Purchasing Policy, and, as a result,' has not complied with the provisions of his employment agreement.  He appears to have disregarded state guidelines on municipal spending.
>
> He generally believes he is not subject to the City's Administrative Memoranda, indicating to staff as recently as July 12 that if he disagreed with the provisions of a City policy setting forth a procedure for the sale of obsolete City equipment, he would simply rewrite it, as it is his prerogative to do so.
>
> A primary responsibility of the City Manager is to see that all laws and ordinances are enforced.  City Charter Section 3.11(b).  The Charter, City Code, Employment Contract and Administrative Code establish definitive boundaries.  In my opinion, the City Manager's behavior manifests a disregard of his responsibilities under Section 3.11(b) of the Charter. being City Manager does not entitle one, through fiat, to avoid definitive boundaries established by this City's founders.

*Id.*

While noting the Council's desire to have Kischnick operate with the discretion of a Chief Executive Officer, Lange aptly responded for our purposes here: "While it is understandable, such discretion is nonetheless subject to corporate and legal boundaries. When discretion exceeds those boundaries, CEOs are held accountable. Discretion is not entrusted to CEOs who do not know how to handle it properly." *Id.* Lange recommended that Council require more strict compliance from Kischnick and employ a set of checks and balances. (Lange Report at 48).

On July 27, 2016, in response to Lange's report and recommendation, the Council resolved that Kischnick pay the City's $1,000 insurance deductible for the car accident; relinquish the Jeep and required that Kischnick provide greater detail with each transaction to document the legitimate purpose of each City expenditure. (City of Troy Media Statement, July 27, 2016). In meting out its punishment, Council also considered Kischnick's "willingness to remediate" through the proposed City Manager Plan of Action Kischnick proposed to Council in response to Lange's report, on July 25, 2016, which Kischnick claimed was intended to "identify the area of focus and incorporate a positive, open, and inclusive city management to ensure the City Manager, staff and City Council are moving forward together and applying the Charter, City Code, and Administrative Policies formally." (City Manager Plan of Action, July 25, 2016). Kischnick's further claimed that the plan was "the basis for a revised City Manager contract to provide a clear approach

to improvement."   Council incorporated Kischnick's Plan into his employment agreement on August 22, 2016.

Kischnick's Plan included several directives under specific initiatives, purchasing, personnel management, and even more importantly, Kischnick's employment agreement, respectively. According to Kischnick's Plan, improvements under Kischnick's employment agreement, included strict adherence to the provisions of the employment agreement and the International City/County Management Association ("IMCA Code") Code of Ethics that was incorporated by reference into Kischnick's employment agreement, which was already a part of Kischnick's employment agreement (Kischnick's Plan at 2).

The very moment at which Kischnick penned the first word of this corrective Plan he stood in direct violation of it.  He was living in a townhouse at Somerset rent free in violation of Tenet 12 of the IMCA Code which reminds public managers that public office is a public trust and a member shall not leverage his or her position for personal gain or benefit.  Kischnick did nothing to change his status at Somerset Apartments, immediately following the issuance of the plan or at any point thereafter for nearly three years.  He made no effort to make any payments until after his illegal conduct was uncovered in this case.  And he illegally solicited and accepted bribes, meals and other things of value repeatedly, for years, while operating under his Plan.

Moreover, the government anticipates that Kischnick will continue to minimize his behavior by claiming that he accepted money because he was desperate, not corrupt. Kischnick's claims of desperation lack credibility because the only thing he seemed desperate to do was live the high life on another man's dime. At no point did he use the cash to pay for his basic necessities. Rather, he used it to wine and dine, excessively at expensive restaurants, and to live in a free townhouse, with all expenses paid. Based on his conduct investigated by Lange and the his escalating corrupt conduct here, it should come as no surprise that Kischnick would end up before this Court for sentencing for bribery.

### C. The Seriousness of Kischnick's Crimes, Just Punishment, And Respect for the Law (18 U.S.C. § 3553(a)(2)(A)

A significant sentence is warranted to reflect the seriousness of Kischnick's crimes, to provide just punishment for those crimes, and to promote respect for the law. While the City Manager of Troy, Kischnick serially and shamelessly used the public's office for his own personal enrichment. As the chief administrative officer of the largest city in Oakland County, with even more power than its mayor, Kischnick enjoyed a position of trust akin to that entrusted to a much larger city, such as with Kwame Kilpatrick, the former mayor of the city of Detroit. As the de facto mayor of the City, Kischnick's behavior reverberated throughout city administrative offices. His repeated violations of both ethical and legal boundaries were so foreign to some city employees that they lodged formal complaints against

34

him.  Rather than motivating city workers to serve the public with honor and integrity, he set a powerful and distressing example for how to abuse public office. He corrupted some and wielded his supreme power to intimidate others to comply with his illegal demands.

Rather than conduct himself so as to maintain public confidence in his profession, local government, and in the performance of the public trust, Kischnick was the poster child of corruption, further eroding the public's confidence in city government. The ugly spectacle of an official who violates his fiduciary responsibilities in return for numerous bribes, over an extended period of time, does untold damage to the faith of our citizens in the integrity and the fairness of their system of government.

As described by a federal judge in the prosecution of a corrupt mayor of Bridgeport, Connecticut:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as "only for the insiders." Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3-01-CR-263, 2006 WL 1210984, at *5 (D. Conn., May 5, 2006).

For his years of blatant corruption, the Court should find that a substantial sentence is necessary not only to sufficiently punish Kischnick, but to promote respect for the law.

### D. Deterring the Criminal Conduct of Others (18 U.S.C. § 3553(a)(2)(B))

Imposing a significant prison sentence on Kischnick also serves the important purpose of deterring future public officials in this district and beyond from engaging in similar misconduct. *See* 18 U.S.C. § 3553(a)(2)(B). General deterrence has its greatest impact in white-collar cases, like this one, because these crimes are committed in a more rational and calculated manner than sudden crimes of passion or opportunity. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)). As a federal judge in Chicago stated:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all --- not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006).

One would think that the 28-year sentence this Court imposed on former Mayor Kwame Kilpatrick would sufficiently deter individuals from using the people's offices to engage in corruption at all, let along years-long corruption. To the contrary, within two years of his appointment, Kischnick was illegally soliciting and accepting bribes, incurring unnecessary expenses for the City, and engaging in other perfidy for his personal benefit, all at the expense of the residents of Troy. By his third year, and approximately two years after the Kilpatrick sentence, Kischnick was requesting free improvements to his personal residence from city contractors. He eventually graduated to the level of soliciting cash outright and free living expenses, totaling nearly $50,000.

And Kischnick enlisted and corrupted other public servants to assist him, despite some of their attempts to serve the residents of Troy honorably. Kischnick acted with impunity, believing that he was above the law, and that the rules of governance did not apply to him. By his own statements to agents following his arrest and the position Kischnick takes here regarding his $15,000 solicitation from the Dilisio's and the free apartment from Solomon, Kischnick fails to appreciate the gravity of his crimes. However, the public servant who exposed some of Kischnick's illegal and unethical conduct did.

Moreover, Kischnick's feigned ignorance for an appreciation of the gravity of his illegal conduct should not be tolerated by this Court. In addition to the conduct outlined here, Kischnick admitted that he regularly accepted free meals and free ice rink time for his children at establishments in Troy, in violation of the IMCA Code. And when medical marijuana operators were actively campaigning for marijuana licenses in Troy during 2017 and 2018, they actively solicited Kischnick, who was more than willing to oblige.

In late November 2017, Kischnick admitted that he solicited $1,000 from a marijuana grow operator in exchange for ensuring that individuals that supported marijuana licenses in Troy were placed on the Troy Study Group investigating the issue; providing favorable information to City council in support of marijuana expansion in Troy; and, using his influence in the City to further the marijuana grow operator's position in order to get the City to opt into medical marijuana expansion in Troy.  Kischnick would also allow that same operator to install Telegram, an application that encrypts text messages so that Kischnick and the marijuana operators could communicate without being intercepted or traced by anyone. Kischnick told agents that he communicated with the marijuana operators approximately every two weeks via Telegram to discuss various matters, including the status of the marijuana proposal before Council and land sales the operators' associates were interested in.  Only an inherently corrupt public official would allow

that. This and the other evidence in this case, including Kischnick's own statements, both when he was accepting the bribes and during his interviews with agents, should convince this Court that during his tenure as City Manager of Troy, Kischnick nearly always operated with corrupt intent.

A very substantial sentence in this case will demonstrate to those who served the City of Troy honorably and all citizens of the region that corruption will be seriously addressed and punished everywhere in southeast Michigan when discovered, whether in Detroit or its suburbs.

## E.  Protecting the Public from Further Crimes by Kischnick (18 U.S.C. § 3553(A)(2)(C)

It does not appear that Kischnick has fully accepted responsibility for his crimes.  Even during his plea colloquy, Kischnick acted as if he was unfamiliar with the factual basis in the Rule 11 Plea Agreement, even though he had reviewed it and, through his counsel, made additions and requested deletions months before the plea hearing and read it again on the very day of the plea hearing. Kischnick would not even admit to the Court that the City received at least $10,000 in federal funds, during each year of the span of his illegal conduct when Kischnick knew full well then and now that Troy had received, for example $1.9 million in 2015 and $2.9 million in 2016.  Kischnick himself knew that because he included that information

in his City Manager's Message that he presented to the Mayor and City Council regarding the City budget.

In addition, Kischnick moved into the Somerset Apartments one month after the whistleblower action was filed against him and remained there even after the investigation revealed misconduct and after he vowed to adhere to the IMCA Code. City's ethical rules. The bold and cavalier manner in which Kischnick violated the rules and operated outside of the boundaries put in place to ensure integrity and public confidence as well as his continued lack of contrition does not give any confidence that he will not commit new crimes if given the liberty to do so. However, it is unlikely that Kischnick will hold a public office again and be given a chance to commit crimes as significant as those which he has been convicted in this case.

### F. Sentenced Contemplated by the Sentencing Guidelines 18 U.S.C. § 3553(a)(4)(A), (b)(1) & (c))

The government concurs with the factual findings and calculations contained in the presentence investigation report (PSR), with the exception of the probation department's finding that Kischnick's solicitation and acceptance of a bribe of a free townhouse and free monthly amenities at the Somerset Apartments is not relevant conduct of the offense. The probation department correctly includes Kischnick's solicitation of $15,000 along with the free driveway, meals and the bribes of cash for purposes of determining the total benefit to him under U.S.S.G. § 2C1.1(b)(2).

However, the government believes that the total benefit he received should be increased by $42,599.00, the value of the rent and amenities provided to Kischnick at Somerset because it is relevant conduct.

## 1. <u>Specific Offense Characteristics</u>

As a starting point, Kischnick's base offense level is fourteen because he committed his bribery crimes while acting as a "public official." U.S.S.G. §§ 2E1.1 & 2C1.1(a)(2).  To make matters worse, Kischnick was not a lower-level public official.  Instead, he was the City Manager of the largest City in Oakland County. He appointed and supervised nearly all of department heads and employees who served at will. As a result, his base offense level is increased by four levels because he was a public official in a "high-level decision making or sensitive position." *Id.* at § 2C1.1(b)(3).  His offense level is increased by another two levels because he solicited and accepted multiple bribes from Dilisio and Solomon. *Id.* at § 2C1.1(b)(1).

## 2. <u>Relevant Conduct</u>

Kischnick's offense level must be further adjusted upward because of the benefit Kischnick received as a result of Kischnick engaging an additional bribe with regards to his free apartment from the Solomon Group, which, though uncharged, should qualify as relevant conduct pursuant to U.S.S.G. § 1B1.3. When sentencing a defendant, the district court may consider as relevant conduct uncharged acts and acts alleged in dismissed counts. *See, e.g., United States v. Miller*, 910 F.2d 1321,

1327 (6th Cir. 1990). "The goal of the relevant conduct provision is to allow a court to impose sentences commensurate with the gravity of the offense." *United States v. Kappes*, 936 F.2d 227,229 (6th Cir. 1991).

To calculate this adjustment, the court must make a reasonable estimate, by a preponderance of the evidence, of the greater of the "actual" benefit/loss and the "intended" benefit/loss. U.S.S.G. § 2B1.1, cmt., app. n. 3(C); *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006); *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006). The court need not establish the value of the benefit/loss with precision, but simply must publish its resolution of contested factual matters forming the basis for its valuation. *United States v. Peppel,* 707 F.3d 627, 645 (6th Cir. 2013).

Section 1B1.3 of the Sentencing Guidelines provides, in relevant part, that the following shall be used in determining a defendant's base offense level for sentencing purposes:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity( a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—(i) within the scope of the jointly undertaken activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable with that criminal activity that occurred during the commission of the offense, or in the course of attempting to avoid detection or responsibility for that offense;

      (2) solely with respect to offenses of a character which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction . . .

Section 3D1.2(d) provides that among the types of offenses which require grouping of multiple counts are those in which the offense level is determined "largely on the total amount of harm or loss," "some other measure of aggregate harm or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."

"Same course of conduct" and "common scheme or plan" are two closely related concepts: for two or more offenses to constitute a common scheme or plan, "they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar *modus operandi*" (U.S.S.G. § 1B1.3, comment. n.5(B)(i)).  Offenses that do not qualify as part of common scheme or plan "may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other to warrant the conclusion that they are part of a single episode, spree, or on-going series of offenses" (*Id*. n.5(B)(ii)).

According to Application Note 5, under the same course of conduct analysis, the factors relevant to whether the offenses are sufficiently related to each other include "the degree of similarity of the offenses, the regularity (repetition) of the

offenses, and the time interval between the offenses." *Id.; see United States v. Henry*, 819 F.3d 856, 864 (6th Cir. 2016) ("The three factors guide this analysis: the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and time intervals between the offenses"), *quoting United States v. Hill,* 79 F.3d 1477, 1482 (6th Cir. 1982). No single factor is dispositive. Rather, the absence of one factor simply requires a stronger presence of a least one of the other factors. *Hill*, 79 F.3d at 1482.

Kischnick's conduct with regards to his free rent at Somerset Apartments satisfies § 1B1.3's same course of conduct offense by all accounts. Kischnick's conduct amounted to bribery under 18 U.S.C. § 666. Kischnick's conduct covers a multi-year course of conduct involving a "stream of benefits" provided by the Solomon Group in exchange for multiple instances in which Kischnick took actions as the City Manager to bestow benefits on Solomon, much like Kischnick did with Dilisio. *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009) (affirming bribery conviction under § 666 and finding "it sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose."). And although both Kischnick and the Solomon Group deny that there was a quid pro quo or that Kischnick was allowed to live in the townhouse rent free for multiple years without any agreement that favorable treatment would

follow as the opportunity arose, their actions speak otherwise. Based on their conduct, an implicit agreement was formed from their words and actions. *Id.* at 518.

First, Kischnick's corrupt intent is evident. When the former owner of the Somerset Apartments refused to give Kischnick a rent free apartment, directing Kischnick to contact the rental office, rather than do that, Kischnick waited until he could coerce a bribe out of the new owners. Kischnick chose Somerset not because he was "desperate" as he claims to find housing anywhere. He chose Somerset because it was the "premier" apartment complex in Troy, and he expected, by his own admission, a significantly discounted or free apartment due to his position. But, at no point did he nor Solomon mention payment. Kischnick's actions, and Solomon's for that matter, belie their words. The former owner of Somerset expressed surprise that the roads surrounding Somerset were being repaired, despite his numerous years-long requests to have them repaired during his ownership, after Kischnick moved into his free townhouse at Somerset, Kischnick uncharacteristically devoted his attention to the logistics regarding the road construction at apartment complex.

Although the roads were already covered with asphalt and the city planned to replace it with asphalt which was the most economical, Kischnick adamantly demanded that the roads be replaced with concrete, This arrangement not only conferred a benefit on the Solomon Group, but on Dilisio too, the same contractor

Kischnick had been accepting and soliciting bribes from at various times during nearly the entire period Kischnick resided at Somerset between 2016 and 2018. More importantly, Solomon did gain an advantage in exchange for providing Kischnick with free rent and amenities. Kischnick facilitated Solomon's negotiation of a contract to replace the aprons and adjoining sidewalks at Somerset with the City's concrete contractor at the same rate Dilisio charged the City. These negotiations and the personal coordination by Kischnick to also accelerate the date for the repair, all occurred during the same period that Kischnick regularly requested bribes from Dilisio for bar tabs; when Kischnick solicited $15,000 from Dilisio, in October 2017; and, accepted cash bribes totaling $3,000 in December 2017 and March 2018. An explicit agreement between Kischnick and the Solomon Group is not required to satisfy § 666. The law is not intended to allow winks and nods to pass unpunished *See Abbey*, 560 F.3d at 518. And "it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as the opportunity arose." *Id*.

Even though Kischnick was not charged with bribery with regards to his free tenancy at Somerset Apartments, his conduct nevertheless constituted a common scheme, or at the very least, was part of the same course of conduct with the Dilisio bribes. Kischnick accepted a stream of monthly benefits from the Solomon Group during the same period that he was accepting bribes and a stream of benefits from

Dilisio.  Like Dilisio, Solomon Group was a business owner, a deep pocket for Kischnick, doing business in the City.  In addition, the conduct is contemporaneous with the conduct of the offense.  And an advantage inured to both the Solomon Group and Dilisio.  Solomon Group negotiated a rate for services that is usually reserved to municipalities, and Dilisio received an additional contract to perform work for a private company while in the performance of its work for the City.  These facts satisfy all three factors under the same course of conduct analysis for relevant conduct.  Therefore, Kischnick's relevant conduct should result in an upward adjustment for being more than one bribe under U.S.S.G § 2C1.1(b)(1) and for the value of the benefit he received from the Solomon Group in the amount $42,599.50 under U.S.S.G. § 2C1.1(b)(2), which results in an additional 4 level increase to Kischnick's offense level.

Under the Probation Office's calculation, which uses $24,478.60 as the value of the benefit Kischnick received, Kischnick's sentencing guideline range is 30 to 37 months.  Applying the additional Solomon Group bribe and the benefit received by Kischnick, the value would increase to $67,078.10 and Kischnick's guideline range is 46 to 57 as the government contemplated in the Rule 11 Plea Agreement.  An additional 4-level adjustment is warranted in this case.

### G. Avoiding Sentencing Disparities Among Similarly Situated Defendants (18 U.S.C. § 3553 (a)(6))

Kischnick's conduct had a significant impact on city employees and the community at large.  For years, several Troy residents vigorously fought for disclosure of Lange's report, further demonstrating citizens' right to expect honesty, integrity and responsibility from their elected officials.  Kischnick's crimes eroded the public confidence in city government.

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Rather, Section 3553(a)(6) "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010). One of the "central reasons" for adopting the sentencing guidelines in the first place "was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Peppel*, 707 F.3d 627, 638-39 (6th Cir. 2013).

This Court has a wealth of experience with corruption cases of this type and is extremely familiar with examples of sentences around the country and right here in this district with which to compare to avoid disparities.  The citizens of Troy are not only watching this case.  So are officials serving the public there and throughout the region and state, some of whom may be tempted—like Kischnick---to use the

public's office to enrich themselves at the expense of their constituents.  While has been demonstrated by the whistleblower action brought against Kischnick, most of the current and future generations of public servants in Troy and elsewhere, those inclined otherwise need to know that there are severe consequences for violating the public trust.  A very substantial sentence in this case will demonstrate to them and to the citizens of the region that corruption will be seriously addressed when discovered.

## IV. Conclusion

Kischnick used his public office for his own personal gain.  Instead of carrying out his duties with integrity and honesty as he was required to do, Kischnick put his own interests first, using his office as leverage for bribes in the form of cash, lavish meals, liquor, free services and free housing. Through this conduct, Kischnick proved that he was "always on your side no matter what," if you paid him enough bribes. And, unfortunately, he corrupted and disillusioned other public servants in the process.

Given the serious nature and circumstances of Kischnick's crimes, the corrupt and deceptive manner in which he carried out his crimes, the seriousness of his offenses, the need to deter others from similarly abusing their power, and the aim to avoid unwarranted sentence disparities among public officials who have inflicted

serious damage on the community, the government respectfully requests that the
Court impose a sentence of 55 months.

                                          Respectfully submitted,

                                          MATTHEW SCHNEIDER
                                          United States Attorney

                                          _____

                                          Dawn N. Ison
                                          Assistant United States Attorney
                                          211 W. Fort St., Suite 2001
                                          Detroit, MI  48226-2311
                                          (313) 226-9567

Dated:           January 17, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>January 18, 2019</u>, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system, which will send

notification of such filings to the following:

*Anjali Prasad, Esq.*
*Attorney for Brian Kischnick*

<u>s/DAWN N. ISON_____</u>
DAWN N. ISON
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9567
Email: dawn.ison@usdoj.gov

Dated: January 18, 2019